UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| CAROL MURPHY, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )   1:12-cv-00101-JAW |
| | ) |
| CORIZON, et al., | ) |
| | ) |
| Defendants | ) |

**RECOMMENDED DECISION**

Carol Murphy, a prisoner at the Maine Correctional Center, has filed a fifty-eight page

complaint naming a number of defendants, mostly employees of Corizon, the private contractor

that provides prison medical services.  The primary thrust of the complaint concerns what

Murphy describes as "substandard medical care at the prison."  The allegations relate to back

problems, dental care, medications for allergies and osteoporosis, response time regarding

medical requests, methods of administering TB tests, policies regarding fire drills when prisoners

are showering, and the administration of prisoner phone and commissary accounts.  As part of

the fifty-eight page complaint, Murphy has attached a November 2011 Final Report from a

Government Oversight Committee:  Health Care Services in State Correctional Facilities –

Weaknesses Exist in MDOC's Monitoring of Contractor Compliance and Performance; New

Administration is Undertaking Systemic Changes.  Three of the named defendants, the Maine

Department of Corrections, Scott Burnheimer, and Joseph Ponte,[1] have moved to dismiss the

complaint as it pertains to them.  I now recommend that the Court grant their motion.

---

[1]      Murphy spells the name "Pont."  The defendants' Motion (ECF No. 15) spells it "Ponte."  I have used the
defendants' spelling throughout.

**Complaint Allegations**

Murphy requests monetary damages and declaratory and injunctive relief.  (See Complaint, <u>Relief</u>, ECF No. 2, at 18.)  Her complaint identifies Joseph Ponte as the Commissioner of the Maine Department of Corrections.  Scott Burnheimer is the superintendent of the prison.  The Maine Department of Corrections is identified as having hired Corizon, which in turn is identified as the entity which employs the medical and dental providers who work at the facility and who Murphy named as individual defendants as well.  (<u>Id</u>. at 3.)  In her response to the Motion to Dismiss (ECF No. 19) and surreply to the Motion (ECF No. 23), Murphy clarifies that Ponte and Burnheimer are being sued both individually, as well as in their official capacities.[2]  I will set forth the allegations in the complaint relating to the defendants who have moved to dismiss the complaint, without belaboring the allegations relating to nonmoving defendants.

***Claim # 1 Back Injury***

This claim involves an incident when Murphy's back "went out" as she was sitting on her bunk in her cell.  Medical personnel prescribed ice packs, Motrin, and a muscle relaxer, which she did not receive until twelve hours after "[her] back was injured."  (ECF No. 2 at 5.)  The complaint does not describe the infliction of any injury by a guard, fellow prisoner, or anyone else.  Murphy could not walk and the prison rules required her to walk to get a food tray.  Therefore she remained hungry for three days before she could hobble to a table and get her meal.  She filed complaints about her treatment with Medical, Burnheimer, and the Maine

---

[2]    Murphy takes issue with Assistant Attorney General James Fortin's representation of Burnheimer and Ponte in their individual capacities.  She claims this represents a waste of taxpayer funds and is legally inappropriate.  (ECF Nos. 19 & 23.)  The Maine Attorney General's duty of representation is set forth at 5 M.R.S. § 191 (3) and extends to all civil actions in which the state has an interest.  It is not apparent to me how the appearance by the assistant attorney general in this case is legally inappropriate, whether the defendants are being sued both individually or in their official capacities.  The complaint clearly arises from their official duties and implicates the management of state facilities.  It is not a stretch to say that the state has an interest in this proceeding.

Department of Corrections.  The Department responded by stating she had received appropriate treatment and that the guards had received a slip from Medical saying that she could have been given a food tray in her cell.  The medical department minimized her complaints, saying that any delays were the result of "mistakes" or "oversights" by specific guards or medical providers.  (Id. at 6.)  Murphy characterizes this complaint as one of deliberate indifference to serious medical needs.

***Claim # 2 Dental Care***

Murphy claims she has been denied preventative dental care, but other female inmates have received preventative care because they complained and researched the law.  She alleges that there is a Corizon/Maine Department of Corrections policy regarding dental fillings that "apparently changes depending on the particular inmate [and] the inmate's legal knowledge." (Id. at 8.)  Burnheimer and Ponte are not mentioned in this claim.

***Claim # 3 Allergy and Osteoporosis Medications***

Murphy complains about the medical treatment and diet she received for pre-existing allergies.  She complained and filed grievances with Medical, Burnheimer and Ponte.  During this period Ponte attended a meeting with inmates and told them he would look into having allergy testing done, but nothing was ever done about that.  When one of the Corizon doctors refused to perform allergy testing and said that Murphy could eat something she was allergic to in order for him to observe her symptoms, she filed a complaint/grievance.  Ponte's response was that the doctor appeared to have responded appropriately to her complaint.

Murphy wanted a prescription for Fosamax because of her bone density test results, which test had been ordered by the medical department.  The medical department would not provide such a prescription.  Murphy filed grievances with Burnheimer and the Maine

Department of Corrections, but they ignored her.  Murphy alleges that Corizon is cutting corners and not providing necessary care and that the Maine Department of Corrections and Ponte are letting them do it "to save money at the expense of the inmate's health."  (Id. at 11.)

### Claim # 4 Delays in Seeing Medical Personnel and Problems with Aspirin

Murphy complains generally that it takes up to fourteen days to get an appointment with a physician, nurse, or physician's assistant.  She also complains that inmates are expected to buy their own aspirin or Advil at a cost of between $0.24 and $0.36 for two tablets.  She complained to both Ponte and Burnheimer.  Ponte said he would look into the "aspirin" issue, especially in the context of indigent prisoners.  Nothing happened as a result of this complaint.  The policy is that medical personnel do not furnish aspirin until after the inmate has seen a doctor.  Ponte says the reason for this policy is that aspirin, Advil, and other over the counter medications have "disappeared" when freely given by nurses to inmates.  (Id. at 13.)

### Claim # 5 TB Testing

The prison requires every inmate to have a TB test.  Corizon and the Maine Department of Corrections have a policy of giving the test and then immediately housing the new person with a cellmate in the general population.  Murphy is worried about potential exposure to inmates who may have the disease.  She contacted the Maine Department of Corrections about her concerns.

### Claim # 6 Fire Drills

Murphy complains about a fire drill that forced her outside with nothing to wear but a thin cotton robe and rubber shower shoes.  The fire drill took place during a cold snowstorm.  When she finally got back into the building and stopped shaking from the cold, she wrote a grievance to Burnheimer, the Maine Department of Corrections, and Ponte.  Ponte replied that

4

prison rules demanded that everyone leave the building at the time of a fire exercise.  Ponte did not send her a copy of the rule, although she demanded twice that he do so.

***Claim # 7 Phone and Commissary Accounts***

According to Murphy, $75.00 was taken from her accounts by prison officials without her authorization.  This money was taken pursuant to a prison rule that allows the prison to take up to 25% of the money in an inmate's account if the inmate violates prisoner regulations.  Murphy maintains that her personal property was taken without due process of law.  She demanded a jury trial before the money was taken, but Burnheimer refused to allow her one.

## Motion to Dismiss Standard

In deciding a motion to dismiss, the court accepts as true the factual allegations of the complaint, draws all reasonable inferences in favor of the plaintiff so long as they are supported by the factual allegations, and determines whether the complaint, so read, sets forth a plausible basis for recovery.  Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 320 (1st Cir. 2008).  To properly allege a claim in federal court, it is not enough merely to allege that a defendant acted unlawfully; a plaintiff must affirmatively plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . .  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'  Id. (citing and quoting Twombly, 550 U.S. at 555).

Additionally, because Murphy is a pro se litigant, her complaint is subjected to "less stringent standards than formal pleadings drafted by lawyers."  Haines v. Kerner, 404 U.S. 519,

520 (1972).  As a pro se litigant, her pleadings also may be interpreted in light of supplemental

submissions, such as her responses to the motions to dismiss.  Gray v. Poole, 275 F.3d 1113,

1115 (D.C. Cir. 2002); Wall v. Dion, 257 F. Supp. 2d 316, 318 (D. Me. 2003).

### Discussion

***The Official Capacity Claims Against the State of Maine***

To the extent Murphy has sued the Commissioner of the Maine Department of

Corrections (Ponte) and the Superintendent of the Maine Correctional Center (Burnheimer) in

their official capacities, the suit is one brought against the State of Maine.  Will v. Mich. Dept. of

State Police, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official

capacity is not a suit against the official but rather is a suit against the official's office. . . .  As

such, it is no different from a suit against the State itself."); see also Kentucky v. Graham, 473

U.S. 159, 165-67 & n.14 (1985).

"As a general matter, 'states are immune under the Eleventh Amendment from private

suit in the federal courts, absent their consent.'"  Wojcik v. Mass. State Lottery Comm'n, 300

F.3d 92, 99 (1st Cir. 2002) (quoting Greenless v. Almond, 277 F.3d 601, 606 (1st Cir. 2002)).

"This immunity extends to any entity that is an 'arm of the state.'"  Id. (quoting In re San Juan

Dupont Plaza Hotel Fire Litig., 888 F.2d 940, 942 (1st Cir. 1989) and citing Mt. Healthy City

Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977)).  Thus, any claim for money

damages against the State, its officials in their official capacities, or one of its agencies such as

the Department of Corrections, is subject to dismissal based upon sovereign immunity.

Furthermore, neither a state nor its officials acting in their official capacities are

"persons" within the meaning of 42 U.S.C. § 1983.  Will, 491 U.S. at 71.  The Court reasoned:

"Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does

6

not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." Id. at 66. Congress did not override a State's sovereign immunity in enacting § 1983, and thus precluded suit for money damages against a state in either federal or state court for a violation of this section. Id.

Of course, a state official sued for prospective injunctive relief would be a person under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State." Graham, 473 U.S. at 167 n.14; Ex parte Young, 209 U.S. 123, 159-60 (1908). However, the Ex parte Young doctrine has been significantly cabined by the United States Supreme Court (see Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261 (1997)), and it does not make sense to maintain an individually named defendant such as the Commissioner of the Department of Corrections as a defendant in this case on the chance that another defendant state actor, such as a medical defendant, might ultimately be found to have violated a constitutional right and the relief might involve some limited prospective injunctive relief. That prospective relief could be obtained from those responsible for the medical care because Murphy's lawsuit is very much about the medical care she received and not necessarily about the enforcement of an unconstitutional state statute, the paradigmatic example of prospective injunctive relief. The prospective relief she requests is uniquely tailored to her personal experiences, e.g., "I also ask that the court rule I may have all work done by dentists NOT hired by or affiliated with Corizon, MDOC or any defendant named in this suit." (ECF No. 2 at 18.) The appropriate individual against whom any relief would be ordered would be the provider of the medical care, not Ponte or Burnheimer, should the Court ultimately determine that Murphy was entitled to some form of prospective relief regarding medical issues. As to the nonmedical issues raised in the complaint, Murphy fails to state a claim against either Ponte or Burnheimer for the reasons discussed below.

*The Individual Claims Against Burnheimer and Ponte*

Murphy asserts two claims that are nonmedical in nature, one claim relating to the fire drill policy and the other relating to the prison's imposition of "fines" up to $100.00 for the violation of prison regulations. In order to obtain payment of those fines, the prison has given itself permission to take up to 25% of an inmate's account balance. Murphy has lost $75.00 from her account as a result of this process as a disciplinary measure for infractions. She claims that her due process rights have been violated. Burnheimer informed her that she could not have a jury trial on the issue of the validity of the "taking." In Sandin v. Conner, 515 U.S. 472, 484 (1995), the United States Supreme Court held prisoners have no right to due process of law in the imposition of disciplinary measures unless those measures constitute "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." The imposition of a disciplinary sentence, including a fine, is not an atypical and significant hardship creating a constitutionally protected interest. McMillan v. Fielding, 136 Fed. Appx. 818, 820 (6th Cir. 2005). In any event, Murphy's complaint references the prison grievance policy, and thus Murphy had a post-deprivation remedy available if she chose to avail herself of that process following the imposition of the fine. The Maine Law Court has recognized that a prisoner can avail herself of the Administrative Procedures Act, 5 M.R.S. §§ 8001-11008, and Rule 80C of the Maine Rules of Civil Procedure when seeking judicial review of the actions of DOC officials pursuant to rulemaking authority. Fleming v. Comm'r, Dept. of Corrs., 2002 ME 74, 795 A.2d 692. Thus her complaint does not state a claim of a constitutional violation by either Ponte or Burnheimer regarding the imposition of the fine. In her response to the Motion to Dismiss, Murphy suggests for the first time that she is actually raising an equal protection issue because "defendants" did not consistently take inmates' money for rule breaking and the fact that her

8

money was taken on two occasions is evidence, in her view, of a denial of equal protection. (Resp., ECF No. 19, at 4.)  She does not plead any facts to suggest that either Ponte or Burnheimer were directly involved in deciding to impose a fine upon her, and her alone.

Murphy's claim that she was forced to participate in a fire drill fares just as poorly.  As the attorney for defendants indicates, there is nothing inherently punitive about requiring inmates to participate in fire drills; indeed, such exercises are designed to increase prisoners' safety and security.  In order to rise to the level of an Eighth Amendment violation, the complained of prison conditions must be "sufficiently serious" so that "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'"  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Although Murphy explains that she was wet and cold as a result of being forced outside when she had been in the shower washing her hair, Murphy does not describe the fire exercise as unduly lengthy.  Although she was only wearing a cotton robe and rubber shower shoes on a cold evening following a snowstorm, she simply does not describe a serious deprivation of life's necessities.  Indeed, a wealthy patron of an exclusive hotel might well have found herself in the exact same situation, forced to stand outside with others, including men, while the building was determined to be safe for occupancy.  Murphy does not allege a constitutional violation.

Turning to the medical claims, both Ponte and Burnheimer are alleged to have deferred to the opinions of the medical personnel in regard to the treatments and drugs prescribed for Murphy.  Their only direct involvement with Murphy in regard to medical issues appears to have been either after the fact of the alleged deprivation or in the context of the prison grievance process.  In order to allege personal liability Murphy would have had to include some factual content suggesting that at least one of the defendants was deliberately indifferent to Murphy's

9

serious medical needs.  Murphy identifies six separate medical issues and she alleges differing involvement by each of the defendants depending upon the issue involved.

Two cases by the United States Supreme Court frame the deliberate indifference inquiry as it pertains to medical care:  Estelle v. Gamble, 429 U.S. 97 (1976), and Farmer, 511 U.S. 825. The Estelle Court identified in the Eighth Amendment protection the "government's obligation to provide medical care for those whom it is punishing by incarceration."  429 U.S. at 103.  It observed:  "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met."  Id.  Unnecessary suffering caused by denial of medical care is "inconsistent with contemporary standards of decency."  Id.  Estelle made clear that "inadvertent failure to provide adequate medical care" does not rise to the level of a constitutional violation and that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."  Id. at 105-06.  "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Id. at 106.

In Farmer, the Court more clearly articulated the standard a plaintiff must meet to hold a prison official liable under the Eighth Amendment.  It identified two elements.  First, the alleged deprivation must be "objectively 'sufficiently serious.'"  511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  Second, the defendant must have a culpable state of mind, which means in prison conditions cases that the defendant was deliberately indifferent to the inmate's health or safety.  Id.  To demonstrate that medical care provided by prison officials violates a prisoner's right under the Eighth Amendment to be free from cruel and unusual punishment, it is not sufficient for a prisoner to prove only that he has not received adequate medical care.  He must also prove that the officials responsible for his care intentionally ignored

a serious medical need or were deliberately indifferent to it.  Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497-98 (1st Cir. 2011).

As always, under the pleading standard it is not enough merely to allege that a defendant acted unlawfully; a plaintiff must affirmatively allege facts that identify the manner by which the defendant(s) subjected the plaintiff to a harm for which the law affords a remedy.  Iqbal, 556 U.S. at 678.  In dealing with a motion to dismiss such as this one, I am not bound to accept mere legal conclusions "couched" as a factual allegation.  Id.  I will consider each of the medical claims only as they pertain to Ponte and Burnheimer, applying these standards to their individualized involvement in the claim.

Murphy's claim regarding her back injury does not mention Ponte by name.  She does allege that "[a]s soon as I was able to hold a pen, I filed complaints with Medical, Scott Burnheimer . . . [and] with Maine Dept. of Corrections."  (ECF No. 2 at 6.)  According to Murphy, the Department responded by indicating that "they" had checked with Medical and were satisfied that she had received timely treatment.  According to the Department of Corrections, Medical had given the guards a medical slip saying that Murphy could be given a food tray in her cell for three days.  (Murphy claims that Medical falsified her records in this regard.)  Apparently Ponte and Burnheimer are being personally sued under one of the following theories.  First, Murphy complains that "defendants" screened providers and chose CMS/Corizon as the medical provider.  (ECF No. 19 at 7.)  Her second theory centers around "defendants'" personal involvement, in that "defendants" received copies of all of her grievances and correspondence concerning the medical treatment issues, but did not conduct an adequate investigation of her claims.  (Id.)  Her first theory of liability quickly goes by the board.  The First Circuit has observed that it is "axiomatic that the doctrine of respondeat superior does not

11

apply to claims under section 1983." <u>Gaudreault v. Salem</u>, 923 F.2d 203, 209 (1st Cir. 1990).
Thus neither Ponte nor Burnheimer can be individually liable for any constitutional violation
committed by CMS/Corizon merely because they "chose" CMS/Corizon as the medical provider
for the facility.

The only remaining avenue for an individual capacity claim against either Ponte or
Burnheimer would be in his role as supervisor. The only direct involvement by Burnheimer in
conjunction with the back issue was that Murphy filed her grievance about medical care with
him. Mere knowledge of a subordinate's wrongful conduct, assuming Ken Topel and "Dan," the
two CMS/Corizon employees implicated by Murphy, were Burnheimer's subordinates and
assuming their conduct was wrongful, cannot establish section 1983 liability for a supervisor.
Rather, there must be an "affirmative link" between the conduct of the supervisor and the
constitutional deprivation experienced by the plaintiff. <u>See</u> <u>Sanchez v. Pereira-Castillo</u>, 590 F.3d
31, 49 (1st Cir. 2009); <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 274-75 (1st Cir. 2009). Examples
of affirmative links include "supervisory encouragement, condonation or acquiescence" in
relation to the deprivation. <u>Maldonado</u>, 568 F.3d at 275 (quoting <u>Pineda v. Toomey</u>, 533 F.3d
50, 54 (1st Cir. 2008)). Deliberate indifference can also result in supervisory liability. <u>Id</u>. There
are no factual allegations that support the theory that Burnheimer encouraged, condoned, or even
acquiesced in unconstitutional conduct by Ken Topel or Dan as it was occurring. The only basis
for liability would have to arise from Burnheimer's alleged deliberate indifference to Murphy's
discomfort based upon the knowledge he received from Murphy's self-reports and his review of
the medical reports.

The complaint does not allege that Burnheimer personally denied Murphy medical care
or that he refused to afford her access to medical care or to the food trays. There is no reason to

infer that Burnheimer even knew of any alleged deprivations until Murphy was finally able to put pen to paper and write out her grievance.  Burnheimer deferred to the judgment of medical professionals to determine what medications would be appropriate to treat Murphy's back issues and he apparently accepted the evidence in the medical records regarding the provision of a food tray.  Since Murphy's allegations reflect that Burnheimer (or someone within the Maine Department of Corrections) responded to her concerns (albeit not with the full blown investigation that Murphy sought), he could not be found to be deliberately indifferent simply for respecting the judgment of the medical providers at the jail.  See Berry v. Peterman, 604 F.3d 435, 440 (7th Cir. 2010) ("As a non-medical administrator, [the jail administrator] was entitled to defer to the judgment of jail health professionals so long as he did not ignore [the inmate].");  Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993) (holding that prison warden could not "be considered deliberately indifferent simply because [he] failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor").  I am satisfied that the allegations against Burnheimer do not amount to a claim of deliberate indifference based upon the grievance that Murphy says she filed with Burnheimer.

As far as Murphy's expressed discontent with the grievance investigation, her allegations do not rise to the level of a constitutional violation.  The mere denial of a grievance, without any direct involvement in the allegedly unconstitutional conduct, does not give rise to personal or supervisory liability under section 1983.  Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009) ("[A] denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983.");  Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999) (holding that the denial of administrative grievances and the failure to remedy the alleged retaliatory behavior do not give

13

rise to liability absent evidence of direct participation, encouragement, authorization, or acquiescence in the alleged violation); <u>Thomas v. Courtroom Deputy for Judge Ronan</u>, Civ. No. 10-0537-PHX-RCB (EV), 2010 WL 2292947, *2, 2010 U.S. Dist. Lexis 64133, *5-6 (D. Ariz. June 8, 2010) ("[W]here a defendant's only involvement in allegedly unconstitutional conduct is the denial of administrative grievances, the failure to intervene on a prisoner's behalf to remedy the alleged unconstitutional behavior does not amount to active unconstitutional behavior for purposes of § 1983.") (collecting additional district court cases to that effect).

Murphy's second medical claim relates to what she perceives as a lack of preventative dental care. Neither Ponte nor Burnheimer are mentioned by name in this claim, which is primarily directed at the Corizon dentist. However, Murphy notes that two other female inmates received fillings from the same dentist who denied Murphy such treatment. Murphy complains that these two other women received the treatments only after fighting for months. To the extent Murphy is suggesting that either Ponte or Burnheimer should be personally liable for a policy that denied her preventative dental care, her own allegations establish that some inmates received the treatments she wants and thus that there is no absolute policy denying such treatment. To the extent that Murphy was treated inappropriately or in violation of a constitutional right, there are simply no allegations that pertain to either Ponte or Burnheimer.

Her third and fourth medical claims relate to the availability of medications for allergies and osteoporosis. When Murphy arrived at the prison, medical personnel changed her allergy medications. The new medications created new health problems for Murphy. Additionally, she had dietary problems because of her allergies to much of the prison food. For eighteen months she filed grievances with Medical, Burnheimer, and Ponte, but she received no assistance in obtaining better allergy tests and a better diet. One time at a meeting with a number of inmates,

Ponte told them he would look into getting allergy testing done at the prison.  The only available allergy testing through the medical department was a thirty-four year old test.  Murphy also complains that the medical personnel would not prescribe Fosamax for her even though she had been taking it prior to incarceration to prevent slow bone loss.  Murphy alleges that Ponte allows Corizon to cut corners and violate the law in order to save money.  These conclusory allegations of wrongdoing do not state a claim for personal liability against Ponte or Burnheimer.

The fifth claim raised by Murphy relates to the speed with which Murphy is able to obtain an appointment with a medical professional and the availability of aspirin on an as-needed basis only if the inmate bought her own aspirin or Advil, an impossibility for an indigent inmate.  Ponte and Burnheimer were advised of this fact and Ponte told the inmates that aspirin and Advil have disappeared when given by the nurses to the inmates.  However, he did say that he would look into the aspirin issue as it pertains to indigent inmates, although Murphy claims that nothing was ever done in that regard.  Murphy's allegations concerning her own situation do not allege a serious medical need and thus she does not satisfy the objective prong of the Farmer test set forth above.  While Murphy's back issues, dental issues, allergy issues, and bone loss issues might potentially be serious medical needs, her description of her own experiences regarding delay in seeing a physician's assistant and in getting the aspirin she wanted simply do not describe a serious medical need for which she was deprived treatment.  Her aspirin and scheduling complaints do not rise to the level of a deliberate indifference constitutional violation by Burnheimer, Ponte, or anyone else.

Murphy's final medical claim relates to the tuberculosis tests routinely conducted for all inmates entering the facility.  Murphy disagrees with Corizon's policy in regard to these tests and believes that the medical personnel are not following accepted medical procedures.  She also

alleges that one individual altered her medical records in regard to the TB test.  Neither Burnheimer nor Ponte is personally mentioned by name when Murphy sets forth this claim, but she does say that she contacted the Maine Department of Corrections with her concerns.  (ECF No. 2 at 13).  If Burnheimer or Ponte had any personal involvement in this issue, it appears they deferred to the judgment of the medical professionals in terms of the procedures surrounding TB tests and thus they would have no personal liability.  Furthermore, Murphy's "claims" surrounding the administration of tuberculosis protocols are allegations of professional medical negligence.  To demonstrate that medical care provided by prison officials violates a prisoner's right under the Eighth Amendment to be free from cruel and unusual punishment, it is not sufficient for a prisoner to allege only that she has received professionally inadequate medical care.  Leavitt v. Corr. Med. Servs., Inc., 645 F.3d at 503-04 (quoting Ferranti v. Moran, 618 F.2d 888, 891 (1st Cir. 1980) (holding that "disagreement on the appropriate course of treatment . . . may present a colorable claim of negligence[] but . . . falls short of alleging a constitutional violation.")).

## Conclusion

Based upon the foregoing I recommend that the Court grant the defendants' motion and dismiss with prejudice claims against Ponte and Burnheimer in both their personal and official capacities.  I further recommend that all official capacity claims for monetary damages against the State of Maine, whether brought against Ponte, Burnheimer, or the Maine Department of Corrections, be dismissed with prejudice.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

July 6, 2012                                 /s/ Margaret J. Kravchuk
                                             U.S. Magistrate Judge